## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SISTERS OF LIFE,

    *Plaintiff,*

    v.

MARY T. BASSETT, Commissioner of the
New York State Department of Health,
in her official capacity,

    *Defendant.*

Case No.  1:22-cv-07529

**COMPLAINT**

**DEMAND FOR
JURY TRIAL**

### NATURE OF THE ACTION

1.  The Sisters of Life is a Roman Catholic order of religious sisters who dedicate their lives to God by professing vows of poverty, chastity, and obedience. The Sisters also take a fourth vow to protect and enhance the sacredness of human life. That vow binds each Sister to the defining gift (or "charism") of the order, which is the Sisters' fundamental belief that every human being is created in the image of God.

2.  For more than 30 years, the Sisters of Life have devoted themselves to prayer, fasting, and service to their communities—including to women who are experiencing difficult, or "crisis," pregnancies. At their Visitation Mission in lower Manhattan, the Sisters offer free help and resources to pregnant women. In building a relationship with each woman, the Sisters seek to understand and meet the needs she expresses— whether emotional, spiritual, or temporal—so that she may have the greatest free- dom to choose life for her child and herself.

3.  Now that mission is under threat because the Sisters of Life do not refer for abortion.

1

4.   A newly-enacted New York statute (the "Act") purports to entitle the Commissioner of the New York State Department of Health to demand and receive internal documents from "limited services pregnancy centers." N.Y. ch. 217 § 2 (McKinney 2023) (forthcoming).

5.   The Act was signed into law on June 13, 2022, one of six abortion-related statutes billed as New York's "nation-leading legislative package to protect abortion and reproductive rights" "in anticipation of [a] final decision by [the] Supreme Court on *Dobbs v. Jackson*." Press Release, N.Y. State Governor's Office, *Governor Hochul Signs Nation-Leading Legislative Package to Protect Abortion and Reproductive Rights for All* (June 13, 2022), https://perma.cc/WSD3-793N (cleaned up).

6.   In her speech at the signing ceremony, New York Governor Kathy Hochul recalled reading the leaked *Dobbs* opinion with "horror and disgust," and decried the pro-life "Neanderthals" who "say women are not entitled to [abortion] rights." Governor Kathy Hochul, *Governor Hochul Signs Nation-Leading Legislative Package to Protect Abortion and Reproductive Rights*, YouTube, at 10:30, 9:45 (June 13, 2022), https://youtu.be/wx6EXENuvL8. Her remarks on the Act were especially pointed: "We're . . . going to have a task force to study the impact of limited service pregnancy centers—*we all know what that means*—on pregnant women." *Id.* at 19:45 (emphasis added).

7.   The Act directs the Commissioner to conduct a study and issue a report about "limited services pregnancy centers," defined as any facility or entity that has the "primary purpose of . . . provid[ing] services to clients who are or may be pregnant,"

that is not a licensed health care facility or is not providing services under the direction of a licensed health care provider, and that "*fails to provide or refer for* the full range of comprehensive reproductive and sexual health care services reimbursed under the state's Medicaid program including contraception, testing and treatment of sexually transmitted infections, *abortion care*, and prenatal care." N.Y. ch. 217 §§ 1, 1-2, 2-1 (emphases added).

8.   The Act then provides that the Commissioner "may request, and shall receive upon request," a broad range of data and information from limited services pregnancy centers. That includes information related to organizational funding; membership in umbrella organizations; services provided and most frequently sought; the number of women who access services and "basic demographic information about each woman, including race, age, and marital status"; whether women seeking services are seeking "comprehensive options counseling or services" at medical facilities; the nature of information given to clients or potential clients; and operational manuals, handbooks, or guidelines. *Id.* § 2-2.

9.   All of the Act's intrusive and burdensome disclosure requirements turn on whether an organization is willing to "refer for . . . abortion care." N.Y. ch. 217 § 1-2. That definitional trigger is plainly predicated on the content of an organization's speech; it is also plainly unconstitutional.

10. The First Amendment violation here is "all the more blatant" because the government is "target[ing] . . . particular views taken by speakers on a subject"—here,

the Sisters' viewpoint on abortion. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

11. On July 15, 2022, the Sisters of Life, through their counsel, sent a letter to Mary T. Bassett, Commissioner of Health at the New York State Department of Health (the "Commissioner"), describing their religious ministry and explaining how the Act violates the U.S. Constitution. The Sisters requested that the Commissioner confirm in writing, by August 1, 2022, that the Department will not attempt to enforce the Act against them.

12. The Commissioner and the New York State Department of Health did not respond.

13. On August 23, 2022, the Sisters of Life, through their counsel, sent a second letter to Commissioner Bassett, again with a copy to General Counsel Marks. The letter reiterated that the Act violates the Constitution and illegally interferes with the Sisters' ministry to pregnant women, and requested a response by August 26.

14. On August 30, counsel for the Sisters of Life received a two-sentence letter from General Counsel Marks that was postmarked August 25. The letter did not disavow enforcement as to the Sisters, as they had twice requested. It instead stated only that "[w]e are reviewing the enacted legislation and determining appropriate next steps for implementation."

15. Because of the Act's unconstitutional disclosure mandate—and because the Commissioner has refused to disavow its enforcement against them—the Sisters of Life are now forced to minister under a cloud of government investigation. Worse still,

the Sisters' relationships of trust and confidence with pregnant women are chilled by the government's claimed ability to obtain documents and information about those women and their conversations with the Sisters—all without a warrant, and without any individualized suspicion of wrongdoing.

16. The Sisters of Life have dedicated their lives to loving God and neighbor. They simply seek to continue their ministry without illegal interference from the government.

17. Because of the Act's unconstitutional intrusion into the Sisters' ministry, the Sisters have suffered and will suffer irreparable harm absent injunctive relief.

## JURISDICTION AND VENUE

18. This action arises under the Constitution and the laws of the United States. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

19. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

20. Venue lies in this district under 28 U.S.C. § 1391(b)(1) and (2).

## THE PARTIES

21. Plaintiff Sisters of Life is a Roman Catholic order of religious sisters who dedicate their lives to God by professing vows of poverty, chastity, and obedience, as well as a fourth vow to protect and enhance the sacredness of human life. The Sisters of Life is incorporated under the laws of the State of New York as a 501(c)(3) nonprofit corporation. The Sisters of Life is also a religious institute of diocesan right.

22. Defendant Mary T. Bassett is the Commissioner of the New Yor State Department of Health (NYDOH). She is sued in her official capacity. *See Ex Parte Young*, 209 U.S. 123 (1908).

## FACTUAL ALLEGATIONS

### The Sisters of Life

23. The Sisters of Life is a Roman Catholic community of religious sisters who give their lives to God by professing lifetime vows of poverty, chastity, and obedience. The Sisters also profess a fourth vow to protect and enhance the sacredness of human life.

24. The Sisters of Life was founded in 1991, after Cardinal John O'Connor penned an article in the local newspaper *Catholic New York* entitled, "Help Wanted: Sisters of Life." In the article, the Cardinal described his vision for a religious community of women who would give themselves fully to the protection and enhancement of the sacredness of every human life, beginning with the most vulnerable. The article was reprinted across the country, and hundreds of letters poured in. On June 1, 1991, eight women gathered in New York to form the Sisters of Life.

25. The Sisters of Life today number more than 100 religious sisters serving in New York, Arizona, Connecticut, Colorado, Pennsylvania, Washington, DC, and Toronto, Canada. In New York State, the Sisters pray and work at their convents in Catskill, New York City, Suffern, and Yonkers.

26. The purpose of the Sisters of Life is to worship the living God. The Sisters provide a consecrated witness to the glory of God, who is the origin of every human life. Like other Catholic religious sisters, they forgo marriage, renounce worldly possessions, and willingly surrender to lives of obedience to Jesus Christ. The Sisters

further consecrate themselves to the protection of human life and the promotion of new life in Jesus Christ. To guide their religious commitments, the Sisters of Life follow the ethical teachings of the Catholic Church.

27. The Sisters of Life believe that all human life is sacred, and that every human being is made in the image and likeness of God. The Sisters accordingly bear witness to the dignity of every human life, including the most vulnerable lives, such as the elderly, the disabled, and the unborn.

28. The Sisters' primary work is prayer and fasting, which require an intense attentiveness to God and occupy many hours of each day. Because love seeks the good of the other, the love the Sisters receive from God in prayer must find expression. Thus, the Sisters also spend significant time actively serving their communities.

29. In addition to evangelization, hosting weekend retreats, and conducting outreach to college students, the Sisters' missions include serving pregnant women in need by giving them the support and resources to be able to choose life for themselves and their children. All of these activities are rooted in the Sisters' fourth vow to uphold the dignity and worth of each person.

30. One such work is the Sisters' Visitation Mission, named after the Gospel account in which Mary, the Mother of Jesus, visits and assists her elderly cousin Elizabeth during a difficult pregnancy. The Visitation Mission, located at St. Andrew's Church in lower Manhattan, is where the Sisters take Mary as their model and offer accompaniment to women during their difficult, or "crisis," pregnancies.

31. At the Visitation Mission, the Sisters listen to a pregnant woman's hopes and fears surrounding her future with a new child. In building relationship, the Sisters endeavor to meet the needs the woman expresses—whether emotional, spiritual, or temporal—so that she may have the greatest freedom to choose life for her child and herself. The Sisters are able to meet these needs through a network of volunteers who desire to help the pregnant women who come into the Sisters' lives.

32. The Sisters of Life provide pregnant women with housing, food, maternity clothes, baby clothes, diapers, and formula, as well as strollers, cribs, car seats, and countless items a mother may need to care for her family. They also connect pregnant women and their children to pro bono medical and legal services and a wide array of social services, including child educational opportunities, daycare, and services for special needs.

33. In addition to providing material support, the Sisters of Life attend to the woman's emotional and spiritual needs and assist her in developing a plan for her future, including by providing help with school applications, job training, language learning, budgeting, and parenting skills.

34. Each year, women reside with the Sisters during pregnancy, childbirth, and for up to six months after the infant's birth.

35. The Sisters of Life offer personal, holistic help for pregnant women in need. That help is rooted in the Sisters' deep love for human life.

36. The Sisters of Life provide all resources and services free of charge.

37. The Sisters of Life gladly serve pregnant women of all religions and no religion.

38. The Sisters of Life serve many pregnant women who are in economic need or relational crisis or both. Many of these women are vulnerable to domestic violence. Many are undocumented and live in fear of encountering the police or other government officials. Many come to the Sisters in search of a safe haven.

39. Building relationships of trust and confidence with pregnant women is a core component of the Sisters' ministry. Many of these women disclose sensitive information about their lives, their needs, and their hopes for the future precisely because they trust the Sisters to hold that information in confidence.

40. Many of these women choose to stay in relationship with the Sisters for years—sometimes decades—as the Sisters become a second home and stable presence that they can turn to throughout their lives.

41. The Sisters of Life operate in accordance with Catholic religious teachings, including Catholic teachings on abortion, contraception, and sterilization.

42. Section 2270 of the Catechism of the Catholic Church teaches that life begins at conception. It states:

> Human life must be respected and protected absolutely from the moment of conception. From the first moment of his existence, a human being must be recognized as having the rights of a person—among which is the inviolable right of every innocent being to life.

43. Thus, the Catholic Church teaches that abortion is "gravely contrary to moral law." Section 2271 of the Catechism of the Catholic Church provides:

> Since the first century the Church has affirmed the moral evil of every procured abortion. This teaching has not changed and remains unchangeable. Direct abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law.

44. Consistent with Catholic Church teaching, the Sisters of Life do not provide or refer for abortion, contraception, or sterilization.

45. Given that the Sisters always work within a woman's free will to make decisions for her life, some women served by the Sisters of Life in the Visitation Mission choose to terminate their pregnancies by abortion. In fact, many of the women who seek the Sisters' support have already experienced at least one or more abortions prior to their current pregnancy.

46. Even if a woman chooses abortion, the Sisters' commitment to love and serve her endures. Many women turn to the Sisters for assistance after an abortion. The Sisters meet with these women individually and host Days of Prayer and Healing, monthly gatherings, and retreats that offer a safe and non-judgmental environment to encounter the mercy of Jesus Christ.

47. Consistent with their lifetime vows, the Sisters of Life intend to continue engaging in substantially similar conduct going forward.

### *Assembly Bill A5499 / Senate Bill S470*

48. On June 13, 2022, Governor Kathy Hochul signed into law Assembly Bill A5499 / Senate Bill S470. The Act was one of six statutes billed as the "nation-leading legislative package to protect abortion and reproductive rights" "in anticipation of [a] final decision by [the] Supreme Court on *Dobbs v. Jackson*." Press Release, New York State Governor's Office, *Governor Hochul Signs Nation-Leading Legislative Package to Protect Abortion and Reproductive Rights for All* (June 13, 2022), https://perma.cc/WSD3-793N (cleaned up).

49. The Act authorizes the New York Commissioner of Health to conduct a study on "the unmet health and resource needs facing pregnant women in New York" and "the impact of limited service pregnancy centers on the ability of women to obtain accurate, non-coercive health care information and timely access to a comprehensive range of reproductive and sexual health care services." N.Y. ch. 217 § 2-1.

50. The Act defines a "limited services pregnancy center" as a facility or entity that has the "primary purpose of . . . provid[ing] services to clients who are or may be pregnant," that is not a licensed health care facility or is not providing services under the direction of a licensed health care provider, and that "fails to provide or refer for the full range of comprehensive reproductive and sexual health care services reimbursed under the state's Medicaid program including, but not limited to contraception, testing and treatment of sexually transmitted infections, abortion care, and prenatal care." *Id.* § 1, 1-2.

51. The Act then provides that the Commissioner "may request, and shall receive upon request," a broad range of "data and information" from limited services pregnancy centers. *Id.* § 2-2. That data and information "shall include but not be limited to" information related to: organizational funding; membership in umbrella organizations; services provided and most frequently sought; the number of women who access services, the geographic regions in which each woman resides, and "basic demographic information about each woman, including race, age, and marital status"[1];

---

[1] The Act provides that "[b]asic demographic information included in any report shall be *published* in the aggregate"—but it requires that information to be disclosed as to "*each woman.*" N.Y. ch. 217 § 2-2(d) (emphases added).

whether centers advertise as medical facilities; whether women seeking services are seeking "comprehensive options counseling or services" at medical facilities; whether centers enroll women in public benefits programs or connect them to other services; the nature of information given to clients or potential clients; and operational manuals, handbooks, or guidelines. *Id.*

52. The Act purports to require all limited services pregnancy centers to turn over this body of information upon the Commissioner's request without a warrant and without any reason to suspect that the organization is violating any law.

53. The Act further directs the Commissioner to establish a taskforce of nine members to support the NYDOH in the development of the study, the review of its findings, and the establishment of specific recommendations for "solutions to address any service gaps . . . identified through the study." *Id.* § 3.

54. The study is required to commence no later than six months following the Act's effective date. *Id.* No later than 18 months following the Act's effective date, the Commissioner must issue a report containing findings and policy recommendations. *Id.*

55. Although the Act does not address penalties for noncompliance, Section 206 of the New York Public Health Law authorizes the Commissioner to assess penalties up to $2,000 "for a violation of or a failure to comply with any term or provision of this chapter." N.Y. Pub. Health L. § 206.

56. The Act thus imposes intrusive and burdensome disclosure requirements—enforced by financial penalties—based on whether an organization is willing to "refer

for . . . abortion care." N.Y. ch. 217 § 1-2. That definitional trigger is plainly predicated on the content of an organization's speech. It is also plainly unconstitutional.

57. The First Amendment violation here is "all the more blatant" because the government is "target[ing] . . . particular views taken by speakers on a subject"—here, the Sisters' viewpoint on abortion. *See Rosenberger*, 515 U.S. at 829.

58. The Act's legislative record is rife with evidence of content and viewpoint discrimination. The sponsor memos for both Senate and Assembly versions of the bill assert that pregnancy centers "engage in misleading or deceptive practices" and "provide inaccurate, misleading, or stigmatizing information about abortion and contraception." Memorandum from the New York State Assembly on A05499, https://perma.cc/P42Z-63U7. The Act's legislative supporters put forward similar claims during floor debates. *See, e.g.*, New York State Assembly Floor Debates at 112 (Apr. 4, 2022), https://perma.cc/3ZBG-6HMM (suggesting limited services pregnancy centers "purport[] to provide a medical service" to pregnant women but instead "provide[] them religious counseling"); New York State Senate Floor Debates at 4407 (May 31, 2022), https://perma.cc/6ETC-7ECG (Senate sponsor explaining that the Act would not apply to abortion clinics even if they do not offer "a full spectrum of counseling services, like alternatives to abortion").

59. Floor debates on an earlier version of the Act were even more explicit. For example, one legislative supporter urged that pregnancy centers need to be regulated because "the religious ideology of these centers' owners and employees takes priority over the health and well-being of the women seeking care." New York State Assembly

13

Floor Debates at 170 (July 21, 2020), https://perma.cc/9J3T-46QF (citing American Medical Association's Journal of Ethics).

60. The Act also "covers a curiously narrow subset of speakers." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2377 (2018).

61. The sponsor memos justify the Act on the ground that "[d]ecisions about pregnancy are time sensitive," and "identifying gaps in health care . . . is critical to achieving optimal health outcomes for women who are or may be pregnant." Memorandum from the New York State Assembly on A05499, https://perma.cc/P42Z-63U7.

62. But the Act imposes no disclosure obligations at all on organizations that provide or refer for abortions. The Act's structure thus evinces a design whereby "'the State has left unburdened those speakers whose messages are in accord with its own views.'" *NIFLA*, 138 S. Ct. at 2378 (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 580 (2011)).

63. The signing ceremony that accompanied the Act's passage leaves no doubt about what messages "are in accord with [the State's] own views." *See id.* During the 40-minute program that preceded the signing, Governor Hochul, Senate Majority Leader Andrea Stewart-Cousins, Assembly Speaker Carl Heastie, and Commissioner Bassett each addressed the assembled crowd.

64. Governor Hochul framed her remarks with the leaked Supreme Court opinion in *Dobbs v. Jackson Women's Health Organization*, telling the crowd: "The sky is on the verge of falling, literally in the next week or two. That is a very real possibility. And that's why we're here today." Press Release, New York State Governor's Office,

*Governor Hochul Signs Nation-Leading Legislative Package to Protect Abortion and Reproductive Rights*, YouTube, at 8:20 (June 13, 2022), available at https://youtu.be/wx6EXENuvL8. She recalled that "millions of Americans" read the leaked opinion with "horror and disgust," because "[i]t reconfirmed our worst of fears that the end of *Roe v. Wade* was actually near." *Id.* at 10:30. She decried the pro-life "Neanderthals" who "say women are not entitled to [abortion] rights." *Id.* at 9:45. And she announced that, "I have three messages on the persistent assault on women's rights and a woman's right to determine and make her own decisions about her own body, and they are simple messages: Not here. Not now. Not ever." *Id.* at 8:35. A standing ovation ensued.

65. Hochul briefly summarized each of the six bills before sitting down to sign them. Her comment on the Act was especially telling: "We're also going to have a task force to study the impact of limited service pregnancy centers—*we all know what that means*—on pregnant women." *Id.* at 19:45 (emphasis added).

66. A few minutes later, Commissioner Bassett took the podium and told the crowd: "I never imagined in my lifetime that we would be in the position where we fully expect the Supreme Court of the United States to roll back the landmark *Roe v. Wade* decision." *Id.* at 33:20. She went on to declare that, "Here in New York State, . . . the protection of abortion rights is enshrined in the law, and today these legal rights are being bolstered. New York is and continues to be a beacon of hope, a safe harbor, a sanctuary." *Id.* at 34:20.

*The Letters*

67. The Sisters of Life is arguably an entity with the primary purpose of providing services to women who are or may be pregnant. The Visitation Mission is arguably a facility with the primary purpose of providing services to women who are or may be pregnant. It is not a health care facility. It is not licensed by the state of New York under article 28 of the Public Health Law or articles 31 and 32 of the Mental Hygiene Law. It also does not provide services under the direction of a health care provider licensed under title 8 of the Education Law.

68. Because the Sisters of Life cannot and do not "provide or refer for the full range of comprehensive reproductive . . . services" required by the State, they regularly engage and intend to continue engaging in a course of conduct that arguably subjects them to the Act's burdensome and intrusive disclosure requirements.

69. Accordingly, on July 15, 2022, the Sisters of Life, through their counsel, sent a letter to Commissioner Bassett, with a copy to Kathy S. Marks, General Counsel for the New York State Department of Health.

70. In the letter, the Sisters described their religious ministry and explained how the Act violates the U.S. Constitution.

71. The Sisters requested that by August 1, 2022, the Commissioner and the Department of Health confirm in writing that they will not attempt to enforce the Act against the Sisters or otherwise force them to disclose their internal documents.

72. The Commissioner and the New York State Department of Health did not respond to the Sisters' letter.

16

73. On August 23, 2022, the Sisters of Life, through their counsel, sent a second letter to Commissioner Bassett, again with a copy to General Counsel Marks. The letter reiterated that the Act violates the Constitution and illegally interferes with the Sisters' ministry to pregnant women. It requested that the Commissioner confirm in writing, no later than August 26, that the Department of Health will not attempt to enforce the Act against the Sisters.

74. On August 30, counsel for the Sisters of Life received a letter from General Counsel Marks that was dated August 24 and postmarked August 25. The letter did not disavow enforcement as to the Sisters, as they had twice requested. The text of the letter is quoted below in its entirety:

> Thank you for contacting us regarding A.5499/S.470, which authorizes the New York State Commissioner of Health to request and receive broad categories of internal information and data from "limited services pregnancy centers". We are reviewing the enacted legislation and determining appropriate next steps for implementation.

75. Because of the Act's unconstitutional disclosure mandate—and because the Commissioner has failed to disavow its enforcement against them—the Sisters of Life are now forced to minister under a cloud of government investigation. The Sisters' relationships of trust and confidence with pregnant women are chilled by the government's claimed ability to obtain documents and information about those women and their conversations with the Sisters.

76. The harm is especially acute as to the Sisters' relationships with undocumented and other vulnerable women, who are frequently sensitive to any risk of being reported to the government. By intruding on the Sisters' confidential conversations

with these women, the Act directly undermines and materially burdens the Sisters'
ministry to these vulnerable populations.

77. In light of these developments, the Sisters of Life have standing to challenge
the Act because they have alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and "a
credible threat of prosecution thereunder." *Silva v. Farris*, -- F.4th --, No. 21-0616,
2022 WL 3650689, at *5 (2d Cir. Aug. 25, 2022) (quoting *Susan B. Anthony List v.
Driehaus*, 573 U.S. 149, 159 (2014)).

78. The Sisters of Life have already suffered irreparable harm as a result of the
Act's unconstitutional disclosure requirements, and they will continue to suffer irreparable harm absent timely injunctive and declaratory relief.

## CLAIMS FOR RELIEF

### Count I

### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Speech Clause
### Content and Viewpoint Discrimination

79. All preceding paragraphs are incorporated by reference.

80. Laws that "target speech based on its communicative content" are "content
based" and "presumptively unconstitutional," and "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."
*Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see also City of Austin v. Reagan
Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) ("A regulation of speech is
facially content based under the First Amendment if it targets speech based on its

communicative content—that is, if it applies to particular speech because of the topic discussed or the idea or message expressed." (cleaned up)).

81. The Act imposes intrusive and burdensome disclosure requirements based on whether an organization is willing to "refer for . . . abortion care." N.Y. ch. 217 § 1-2. Because that trigger turns on the content of an organization's speech, the Act is content based and presumptively unconstitutional.

82. Defendant has no compelling interest in targeting organizations that do not "refer for . . . abortion care" for intrusive and burdensome disclosure requests. *See id.*

83. Defendant has not selected the least restrictive means to further any governmental interest.

84. The First Amendment violation here is particularly "blatant" because the government is "target[ing] . . . particular views taken by speakers on a subject"—here, the Sisters' views on abortion, contraception, and sterilization. *See Rosenberger*, 515 U.S. at 829. The Act thus engages in viewpoint discrimination, a particularly "egregious form of content discrimination." *Id.*

85. Governor Hochul's "congratulatory statement[s]" boasting of New York's "forward thinking" are simply further evidence that "viewpoint discrimination is inherent in the design and structure of th[e] Act." *See NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring).

86. The Sisters have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendant.

**Count II**

**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Exercise and Establishment Clauses**
**Church Autonomy**

87. All preceding paragraphs are incorporated by reference.

88. Under the Free Exercise and Establishment Clauses of the First Amendment, religious groups have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

89. Government interference in the sphere of "faith and doctrine" "would obviously violate the free exercise of religion, and any attempt by government to dictate or even influence such matters would constitute one of the central attributes of an establishment of religion. The First Amendment outlaws such intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). In a separate but "closely linked" sphere, the First Amendment also protects the autonomy of religious organizations "with respect to internal management decisions that are essential to the institution's central mission." *Id.*

90. As a matter of core faith and doctrine, the Sisters do not provide or refer for abortion, contraception, or sterilization.

91. The Sisters decide all issues of internal governance consistent with their underlying religious commitment to the sanctity of human life. These include myriad decisions—such as how to serve, support, and counsel pregnant women—that are essential to the Sisters' central mission.

20

92. The Act attempts to dictate and influence the Sisters' decisions regarding matters of faith and doctrine. It also targets and interferes with the Sisters' internal governance, management, and decision-making.

93. The Act thus violates both Religion Clauses, which guarantee the Sisters' First Amendment right to decide matters of faith and doctrine, govern themselves, and care for pregnant women "free from state interference." *Kedroff*, 344 U.S. at 116.

94. The Sisters have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendant.

**Count III**

**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Exercise and Establishment Clauses**
**Church Autonomy: Improper Investigation**

95. All preceding paragraphs are incorporated by reference.

96. Under the Free Exercise and Establishment Clauses of the First Amendment, the government may not engage in entangling investigations into religious matters, since the "very process of inquiry" can "impinge on rights guaranteed by the Religion Clauses." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979).

97. Church autonomy thus forbids the "forced disclosure" of a religious organization's "internal communications." *See Whole Woman's Health v. Smith*, 896 F.3d 362, 374 (5th Cir. 2018). The use of governmental power to pry into a religious organization's internal affairs not only interferes with its "decision-making processes," but also "exposes those processes to an opponent and will induce similar ongoing intrusions against religious bodies' self-government." *Id.* at 373.

98. How the Sisters choose to govern themselves and care for pregnant women are "matter[s] of intense doctrinal concern." *See id.*

99. Forcing the Sisters of Life to hand over their internal documents and communications would thus "interfere[] with [their] decision-making processes on a matter of intense doctrinal concern" and intrude on their "self-government." *See id.*

100.    The Act thus violates both Religion Clauses, which guarantee a heightened "independence" for churches and religious organizations "from secular control or manipulation." *See Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 186 (2012).

101.    The Sisters have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendant.

### Count IV

### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Exercise Clause
### Not Neutral

102.    All preceding paragraphs are incorporated by reference.

103.    The government is "obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [religious actors'] religious beliefs." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018).

104.    "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

105.   When "'official expressions of hostility' to religion accompany laws or poli-cies burdening religious exercise," courts must "'set aside' such policies without fur-ther inquiry." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 n.1 (2022) (quot-ing *Masterpiece*, 138 S. Ct. at 1732)).

106.   The Act is not neutral with regard to religion.

107.   The Act's legislative history and signing statements evince anti-religious animosity.

108.   The Act targets a subset of religiously motivated actors while failing to pur-sue the same alleged state interest against those who refer for abortion.

109.   The Act thus "violate[s] the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *See Master-piece*, 138 S. Ct. at 1731.

110.   The Sisters have suffered and will suffer irreparable harm absent injunc-tive and declaratory relief against Defendant.

## Count V

### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Exercise Clause
### Not Generally Applicable

111.   All preceding paragraphs are incorporated by reference.

112.   "[L]aws burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).

113.   A law is not generally applicable when it "fail[s] to prohibit nonreligious conduct that endangers" the government's regulatory interest "in a similar or greater degree" than the prohibited religious conduct. *Id.* at 543.

114.    Put differently, a law fails general applicability if it "treat[s] *any* compara-ble secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam); *see also Fulton*, 141 S. Ct. at 1877.

115.    "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon,* 141 S. Ct. at 1296.

116.    Here, the asserted government interest is that "[d]ecisions about pregnancy are time sensitive," and "identifying gaps in health care . . . is critical to achieving optimal health outcomes for women who are or may be pregnant." Memorandum from the New York State Assembly on A05499, https://perma.cc/P42Z-63U7.

117.    But the Act imposes no disclosure obligations at all on secular organizations that provide or refer for abortions, notwithstanding the State's asserted interest in "identifying gaps in health care" and "[m]eeting the health and resource needs of pregnant women." *Id.* That omission renders the Act not generally applicable.

118.    It is "no answer that a State treats some comparable secular [organizations] as poorly as or even less favorably than the religious exercise at issue." *Tandon*, 141 S. Ct. at 1296. That pro-life, secular organizations are subject to the Act's burdensome requirements does not erase the fact that the Act "treat[s] *any* comparable secular" organizations more favorably than religious ones. *See id.*

119.    The Act thus triggers strict scrutiny.

120.   Defendant has no compelling interest in requiring religious organizations to comply with intrusive and burdensome disclosure requests, but not applying those same requirements to other secular facilities.

121.   Defendant has not selected the least restrictive means to further any governmental interest.

122.   The Sisters have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendant.

### Count VI

**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Assembly, Free Speech, and**
**Free Exercise Clauses**
**Right of Assembly**

123.   All preceding paragraphs are incorporated by reference.

124.   The First Amendment protects the right of people "peaceably to assemble" to engage in religious exercise and speech activities with persons of their choosing. *See Thomas v. Collins*, 323 U.S. 516, 530-40 (1945).

125.   The Sisters of Life assemble with each other, with the women they serve, and with their supporters, affiliates, and volunteers as an expression of their faith.

126.   The Act infringes the Sisters' First Amendment right "peaceably to assemble" for religious exercise and speech activities by imposing intrusive and burdensome disclosure requirements. *See id*. at 530.

127.   Defendant does not have a compelling interest in restricting the Sisters' peaceable assembly.

128.   Restricting the Sisters' peaceable assembly is not the least restrictive means to further any governmental interest.

129.   The Sisters have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendant.

**Count VII**

**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Speech and Free Exercise Clauses**
**Right of Association**

130.   All preceding paragraphs are incorporated by reference.

131.   The First Amendment protects the "freedom to engage in association" with others "for the advancement of beliefs and ideas." *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958). The right of association prohibits governmental action that either "direct[ly]" "restrict[s] the right of [persons] to associate freely," or that has the "effect of curtailing the freedom to associate." *Id.* at 460-61.

132.   Compelling an organization to disclose the identities of its supporters and those who use its services is likely to chill speech by the organization, the women it serves, and its supporters, all of whom may "face[] a risk of reprisals if their affiliation with the organization became known." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021).

133.   The Sisters of Life engage in protected association when they support and care for women experiencing crisis pregnancies, and when they engage supporters, affiliates, and volunteers to help carry out that work.

134.    The Act has a chilling effect on the Sisters' expressive association by requiring them to make decisions about how they minister and speak their religious beliefs under a cloud of government investigation.

135.    The Sisters' discussions with pregnant women will likewise be chilled by both parties' awareness of the government's claimed ability to obtain documents and information about the discussions and about the women seeking help.

136.    The Act thus infringes the Sisters' First Amendment right to associate with others for the purpose of expression.

137.    Defendant does not have a compelling interest in restricting the Sisters' expressive association.

138.    Restricting the Sisters' expressive association is not the least restrictive means to further any governmental interest.

139.    The Sisters have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendant.

**Count VIII**

**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. IV**
**Unreasonable Search and Seizure**

140.    All preceding paragraphs are incorporated by reference.

141.    The Fourth Amendment does not permit the government to "engag[e] in arbitrary fishing expeditions" or "select targets of investigation out of malice or an intent to harass." *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000) (citing *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991)).

142.   The Sisters of Life have a reasonable expectation of privacy in their records. The Act purports to compel the Sisters to disclose a litany of confidential information, including information about their internal procedures, affiliate relationships, and volunteers. The Sisters take various measures to guard such confidential information from public disclosure.

143.   The women served by the Sisters of Life also have privacy interests in the non-public personal information they disclose to the Sisters. These women reasonably expect that such private information would be used only for the limited purpose of facilitating the care and support the Sisters provide. And the Sisters share the interests of these women in maintaining their privacy, so that the women will continue to have trust and confidence in the relationships they have developed with the Sisters.

144.   The Act violates the Fourth Amendment because it improperly authorizes the Commissioner to obtain internal documents and information without a warrant and without any reason to suspect that the organization is violating the law. And it does so without any form of precompliance review.

145.   The Sisters have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendant.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

a.   Declare that the Act violates the Free Speech Clause of the First Amendment to the United States Constitution by discriminating against the Sisters of Life based on the content and viewpoint of their speech;

b.  Declare that the Act violates the Free Exercise and Establishment Clauses of the First Amendment by violating the autonomy of the Sisters of Life to make decisions regarding faith, doctrine, and internal governance free from governmental interference;

c.  Declare that the Act violates the Free Exercise Clause of the First Amendment to the United States Constitution because it is not neutral or generally applicable;

d.  Declare that the Act violates the Assembly, Free Exercise, and Free Speech Clauses of the First Amendment to the United States Constitution by infringing the Sisters' right peaceably to assemble with others as an expression of their faith;

e.  Declare that the Act violates the Free Speech and Free Exercise Clauses of the First Amendment to the United States Constitution by infringing the Sisters' right to associate with others for the purpose of expression;

f.  Declare that the Act violates the Fourth Amendment to the United States Constitution by subjecting the Sisters to invasive and burdensome disclosure requirements without a warrant and without any individualized suspicion of wrongdoing;

g.  For the foregoing reasons, declare the Act unconstitutional both on its face and as applied to the Sisters.

h.  Issue a permanent injunction prohibiting the Defendant, the Defendant's agents and employees, and all those acting in concert with the Defendant, from enforcing the Act;

i.  Award Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

j.  Award such other relief as the Court may deem equitable, just, and proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 2nd day of September, 2022.

/s/ Angela Wu Howard
Angela Wu Howard
  Bar No. AW6290
Mark L. Rienzi*
  D.C. Bar No. 494336
Rebekah P. Ricketts*
  Texas Bar No. 24074883
Daniel L. Chen*
  California Bar No. 312576
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, DC 20006
(202) 955-0095

*Applications *pro hac vice*
  forthcoming
