# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SISTERS OF LIFE, | Case No. 1:22-cv-07529-LGS |
| *Plaintiff,* | |
| v. | **Oral Argument Requested** |
| MARY T. BASSETT, Commissioner of the New York State Department of Health, in her official capacity, | |
| *Defendant.* | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Mark L. Rienzi*
D.C. Bar No. 494336
Rebekah P. Ricketts*
Texas Bar No. 24074883
Daniel L. Chen**
California Bar No. 312576
Angela Wu Howard
SDNY Bar No. AW6290
Daniel M. Vitagliano
SDNY Bar No. 5856703
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20006
Telephone: 202.955.0095
Facsimile: 202.955.0095

*Applications *pro hac vice* pending
**Application *pro hac vice* forthcoming

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................. 1

BACKGROUND ................................................................................................ 2

    A. The Sisters of Life ............................................................................. 2

    B. Assembly Bill A5499 ......................................................................... 5

    C. The Commissioner's failure to disavow enforcement ....................... 8

LEGAL STANDARD ........................................................................................ 9

ARGUMENT ..................................................................................................... 9

I. The Sisters of Life are likely to succeed on the merits. ......................... 9

    A. The Act violates the Free Speech Clause by discriminating
       based on content and viewpoint. .......................................................... 9

    B. The Act violates the Sisters' church autonomy rights.................... 12

    C. The Act violates the Free Exercise Clause..................................... 15

    D. The Act violates the Sisters' rights of association and assembly.... 18

    E. The government cannot carry its burden under strict scrutiny...... 19

    F. The Act violates the Fourth Amendment........................................ 21

II. The remaining preliminary injunction factors favor relief.................... 24

CONCLUSION................................................................................................. 25

CERTIFICATE OF SERVICE ....................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Agudath Israel of Am. v. Cuomo,*
  983 F.3d 620 (2d Cir. 2020) .................................................................. 9, 24

*Airbnb, Inc. v. City of New York*
  373 F. Supp. 3d 467 (S.D.N.Y. 2019) ...................................... 21-22, 23

*Ams. for Prosperity Found. v. Bonta,*
  141 S. Ct. 2373 (2021) ..................................................................... 18, 19

*Belya v. Kapral,*
  45 F.4th 621 (2d Cir. 2022) ..................................................................... 13

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) .................................................................................. 18

*Bronx Household of Faith v. Bd. of Educ. of N.Y.,*
  331 F.3d 342 (2d Cir. 2003) ..................................................................... 25

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) .................................................................................. 20

*Butler v. St. Stanislaus Kostka Catholic Acad.,*
  __ F. Supp. 3d __, 2022 WL 2305567 (E.D.N.Y. June 27, 2022) .......... 14

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ............................................................................. 15-16

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
  142 S. Ct. 1464 (2022) ............................................................................. 10

*City of Los Angeles v. Patel,*
  576 U.S. 409 (2015) ............................................................................. 22-23

*Cornelio v. Connecticut,*
  32 F.4th 160 (2d Cir. 2022) ..................................................................... 19

*Corp. of the Presiding Bishop v. Amos,*
  483 U.S. 327 (1987) .................................................................................. 14

*De Jonge v. Oregon,*
  299 U.S. 353 (1937) .................................................................................. 19

*Delaware v. Prouse,*
    440 U.S. 648 (1979) ........................................................................ 23

*Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020) ........................................................................ 24

*Evergreen Ass'n, Inc. v. City of New York,*
    740 F.3d 233 (2d Cir. 2014) ....................................................... 20, 25

*Fratello v. Archdiocese of N.Y.,*
    863 F.3d 190 (2d Cir. 2017) ............................................................ 13

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) ............................................................. 17, 19-20

*A.H. ex rel. Hester v. French,*
    985 F.3d 165 (2d Cir. 2021) ...................................................... 9, 24, 25

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
    565 U.S. 171 (2012) ........................................................................ 13

*Hyung Jin Moon v. Hak Ja Han Moon,*
    431 F. Supp. 3d 394 (S.D.N.Y. 2019) ............................................. 13

*Jolly v. Coughlin,*
    76 F.3d 468 (2d Cir. 1996) ............................................................. 24

*Kennedy v. Bremerton Sch. Dist.,*
    142 S. Ct. 2407 (2022) ............................................................. 15, 16-17

*Martindale v. Novello,*
    786 N.Y.S.2d 616 (3d Dep't 2004) .................................................. 6

*Masterpiece Cakeshop, Ltd. v. Col. Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018) ................................................................. 16-17

*Matal v. Tam,*
    137 S. Ct. 1744 (2017) .................................................................... 20

*McCullen v. Coakley,*
    573 U.S. 464 (2014) .................................................................... 11, 21

*Mitchell v. Helms,*
    530 U.S. 793 (2000) ........................................................................ 15

*Mullins v. City of New York,*
    626 F.3d 47 (2d Cir. 2010) ............................................................. 24

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 449 (1958) ........................................................ 18

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA),*
    138 S. Ct. 2361 (2018) ................................................ 9, 12

*New Hope Fam. Servs., Inc. v. Poole,*
    966 F.3d 145 (2d Cir. 2020) ..................................... 15, 16

*New York Progress & Prot. PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) ............................................ 25

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................ 25

*NLRB v. Catholic Bishop,*
    440 U.S. 490 (1979) ........................................................ 14

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ........................................... 12-13, 14

*Patel v. City of Los Angeles,*
    738 F.3d 1058 (9th Cir. 2013) ........................................ 22

*Picard v. Magliano,*
    42 F.4th 89 (2d Cir. 2022) .............................................. 10

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ............................................. 9, 11, 21

*Riley v. California,*
    573 U.S. 373 (2014) ........................................................ 23

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ................................................... 10-11

*Rweyemamu v. Cote,*
    520 F.3d 198 (2d Cir. 2008) ............................................ 13

*Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich,*
    426 U.S. 696 (1976) ........................................................ 14

*In re Subpoena Duces Tecum,*
    228 F.3d 341 (4th Cir. 2000) ..................................... 23, 24

*Surinach v. Pesquera de Busquets,*
    604 F.2d 73 (1st Cir. 1979) ........................................ 14-15

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ........................................................ 17-18

*Thomas v. Collins*,
    323 U.S. 516 (1945) ............................................................... 19

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950) ............................................................... 22

*Wandering Dago, Inc. v. Destito*,
    879 F.3d 20 (2d Cir. 2018) .................................................. 9-10

*Whole Woman's Health v. Smith*,
    896 F.3d 362 (5th Cir. 2018) ........................................... 14, 15

*Williams v. Annucci*,
    895 F.3d 180 (2d Cir. 2018) ........................................... 20-21

**Statutes**

N.Y. Pub. Health L. § 206 ......................................................... 6

N.Y. ch. 217 § 1-2 ............................................................*passim*

**Other Authorities**

John D. Inazu, *Liberty's Refuge* (2012) .................................... 19

**INTRODUCTION**

The Sisters of Life is a Catholic community of religious sisters who have spent the last 30 years helping women who face unplanned pregnancies. They provide all resources and services free of charge, and gladly serve pregnant women of all religious backgrounds, including those who profess no religion. Yet under a newly enacted statute, the State of New York now asserts the power to compel disclosure of "broad categories of internal information" from their religious order—all because the Sisters do not "refer for . . . abortion." This includes sensitive private information about the Sisters' internal governance and religious beliefs, details about their training and supporters, and even personal details about the individual women they help. The government supposedly wants all this information to "study" pregnancy centers that share the Sisters' "Neanderthal" viewpoint on abortion.

But New York has no authority to declare open season on the private internal records and information of disfavored speakers, especially religious ones, even if supporters of abortion want them to. The law at issue here, Assembly Bill A5499 (the "Act"), is plainly unconstitutional and should be enjoined. Targeting those who speak with a disfavored viewpoint—even on an issue as fraught as abortion—is the quintessential free speech violation. Doing so in a way that allows the government to troll through the documents of a religious order violates both church autonomy and free exercise. Demanding special disclosures from the Sisters because they work with pregnant women who need help violates the freedoms of association and assembly. And compelling disclosure of the papers and effects of private citizens—all without a

warrant, and without individualized suspicion of any wrongdoing—violates the Fourth Amendment's most basic protections.

After the Act was passed in mid-June 2022, the Sisters twice contacted Defendant Bassett, explaining the Act's constitutional defects and seeking her assurance that she would not use it against their ministry. Defendant failed to disavow enforcement and instead claimed that the Act authorizes her to command disclosure of "broad categories of internal information" from organizations like the Sisters.

Unable to obtain Defendant's agreement, the Sisters now seek a preliminary injunction holding what should have been obvious from the start: New York has no authority to command disclosure of the Sisters' information under this invalid law. Because the Sisters easily meet the legal standard for a preliminary injunction—and because the Act is invalid under the First and Fourth Amendments—this Court should enjoin Defendant from enforcing the Act.

## BACKGROUND

### A. The Sisters of Life

The Sisters of Life is a Catholic community of religious sisters who dedicate their lives to God by professing vows of poverty, chastity, and obedience. Ex.1 ¶ 7.[1] They also profess a fourth vow to protect and enhance the sacredness of human life. *Id*. On June 1, 1991, eight women gathered in New York to form the order. *Id.* ¶ 6. Today, the Sisters number more than 100 and serve across the United States and in Canada.

---

[1]    Citations to "Ex.__" refer to the exhibits to the Declaration of Mark L. Rienzi submitted in support of this motion.

*Id.* ¶¶ 2, 8. In New York, the Sisters pray and work at their convents in New York City, Catskill, Suffern, and Yonkers. *Id.* ¶ 2.

The purpose of the Sisters of Life is to worship the living God. *Id.* ¶ 9. Their primary work is prayer and fasting, which occupy many hours of each day. *Id.* ¶ 11. The Sisters also spend significant time actively serving their communities. *Id.* One way the Sisters fulfill their vows is through their Visitation Mission, named after the Gospel account in which Mary, the Mother of Jesus, visits her cousin Elizabeth during a difficult pregnancy. *Id.* The Visitation Mission, located at St. Andrew's Church in Foley Square, Manhattan, is where the Sisters take Mary as their model and offer accompaniment to pregnant women. *Id.* ¶¶ 11-12.

At the Visitation Mission, the Sisters listen to a pregnant woman's hopes and fears surrounding her future with a new child. *Id.* ¶ 12. In building this relationship, the Sisters endeavor to meet the needs the woman expresses—whether emotional, spiritual, or temporal—so that she may have the greatest freedom to choose life for her child and herself. *Id.* Working with a network of volunteers, the Sisters provide pregnant women with housing, food, clothes, diapers, formula, and many other items a pregnant woman may need to care for her family. *Id.* ¶ 13. They also connect pregnant women and their children to pro bono medical and legal services and a wide array of social services, including child educational opportunities, daycare, and services for special needs. *Id.* Each year, women reside with the Sisters during pregnancy for approximately six months after the child's birth. *Id.* The Sisters assist women in de-

veloping a plan for the future by providing, among other things, help with school applications, job training, language learning, budgeting, and parenting skills. *Id.* The Sisters provide all resources and services free of charge and gladly serve pregnant women of all religious backgrounds, including those who profess no religion. *Id.* ¶ 14.

Many women who turn to the Sisters for help are in economic need, relational crisis, or both. *Id.* ¶ 29. Many are undocumented and live in fear of police encounters and deportation; others are vulnerable to domestic violence. *Id.* Building relationships of trust and confidence with these women is thus a core component of the Sisters' ministry. *Id.* ¶ 30. Many women disclose sensitive information about their lives, needs, and hopes because they trust the Sisters to hold that information in confidence. *Id.* Indeed, the Sisters are regularly asked about whether such information will be kept confidential. *Id.* ¶¶ 30, 33-34.

The Sisters follow Catholic teaching that "[h]uman life must be respected and protected absolutely from the moment of conception" and that abortion is "gravely contrary to moral law." *Id.* ¶ 15; Ex.3. Accordingly, they do not provide or refer for abortion, contraception, or sterilization. Ex.1 ¶¶ 15-17; Ex.3.

Given that the Sisters always work within a woman's free will to make decisions for her life, some women served by the Sisters choose to terminate their pregnancies by abortion. Ex.1 ¶ 21. Even if a woman chooses abortion, the Sisters' commitment to love and serve her doesn't change. *Id.* Many women turn to the Sisters for assistance after an abortion. *Id.* ¶ 22. The Sisters meet with these women individually and host retreats that offer a safe and non-judgmental environment to experience healing. *Id.*

**B. Assembly Bill A5499**

On June 13, 2022, Governor Kathy Hochul signed Assembly Bill A5499 (the "Act") into law as one of six New York statutes billed as the "nation-leading legislative package to protect abortion and reproductive rights" "in anticipation of [a] final decision by [the] Supreme Court on *Dobbs v. Jackson.*" Ex.4 (cleaned up) (Press Release, available at https://perma.cc/WSD3-793N).

The Act authorizes the Commissioner of the State Department of Health to conduct a study on "the impact of limited service pregnancy centers on the ability of women to obtain accurate, non-coercive health care information and timely access to a comprehensive range of reproductive and sexual health care services." N.Y. ch. 217 § 2.1. It defines a "limited services pregnancy center" as a facility or entity that has the "primary purpose of . . . provid[ing] services to clients who are or may be pregnant"; that is not a licensed health care facility or is not providing services under the direction of a licensed health care provider; and that "*fails to provide or refer for* the full range of comprehensive reproductive and sexual health care services reimbursed under the state's Medicaid program including, but not limited to contraception, testing and treatment of sexually transmitted infections, *abortion care*, and prenatal care." *Id.* § 1, 1.2 (emphases added).

The Act further provides that the Commissioner "shall receive upon request" a broad range of data and information from limited services pregnancy centers. *Id.* § 2.2. That data and information includes, "but [is] not . . . limited to," information related to: organizational funding; membership in umbrella organizations; services provided and most frequently sought; the number of women who access services, the

geographic regions in which each woman resides, and "basic demographic information about each woman, including race, age, and marital status"[2]; whether centers advertise as medical facilities; whether women seeking services are seeking "comprehensive options counseling or services" at medical facilities; whether centers enroll women in public benefits programs or connect them to other services; the nature of information given to clients or potential clients; and operational manuals, handbooks, or guidelines. *Id.*[3]

Finally, the Act directs the Commissioner to establish a task force of nine members to assist with the study. *Id.* § 3. The study is required to commence no later than December 13, 2022—six months after the Act's effective date. *Id.* §§ 3, 4 ("This act shall take effect immediately."). Within 18 months of the effective date, the Commissioner must issue a report containing findings and policy recommendations. *Id.* § 3.

The Act singles out "limited services pregnancy centers"—those that fail to "refer for the full range of comprehensive reproductive and sexual health care services," including "abortion care," *id.* § 1.2—for investigation. The legislative record reflects that same focus on organizations with pro-life beliefs. The Act's sponsor memo, submitted by Assemblymember Deborah Glick, asserts that limited services pregnancy centers "engage in misleading or deceptive practices" and "provide inaccurate, mis-

---

[2]    The Act provides that "[b]asic demographic information" "shall be *published* in the aggregate," but it requires that information to be disclosed as to "*each woman.*" N.Y. ch. 217 § 2.2(d) (emphases added).

[3]    Although the Act does not address penalties for noncompliance, other state law authorizes the Commissioner to impose $2,000 fines "for a violation of or a failure to comply with any term or provision of this chapter." N.Y. Pub. Health L. § 206(4)(c); *see Martindale v. Novello*, 786 N.Y.S.2d 616, 762 (3d Dep't 2004) (noting a "maximum statutory penalty" under Section 206(4)(c) totaling $84,000).

leading, or stigmatizing information about abortion and contraception." Ex.5 (available at https://perma.cc/P42Z-63U7). The Act's legislative supporters made similar claims during floor debates. For example, Assemblymember Jennifer Lunsford asserted that limited services pregnancy centers "purport[] to provide a medical service" to pregnant women but instead "provide[] them religious counseling." Ex.6 at 112. And on an earlier version of the Act, Assemblymember Charles Lavine urged that limited services pregnancy centers should be regulated because "the religious ideology of these centers' owners and employees takes priority over the health and well-being of the women seeking care." Ex.7 at 170-71. Abortion advocates such as Planned Parenthood publicly supported the Act, urging the government to use its power to "study" their political opponents. Ex.13 (available at https://perma.cc/96S3-ALVB).

During the 40-minute program that preceded the signing of the Act, Governor Hochul—along with the Commissioner, the Senate Majority Leader, and the Assembly Speaker—addressed the assembled crowd. Governor Hochul framed her remarks around the leaked Supreme Court opinion in *Dobbs*, telling the crowd: "The sky is on the verge of falling . . . [T]hat's why we're here today." Ex.8 at 9:16-19 (transcript); Ex.9 at 8:20 (YouTube video, available at https://youtu.be/wx6EXENuvL8). Governor Hochul recalled reading the leaked opinion with "horror and disgust," because "[i]t reconfirmed our worst of fears—that the end of *Roe v. Wade* was actually near." Ex.9 at 10:30; Ex.8 at 10:22-11:2 (cleaned up). She decried people who "say women are not entitled to [abortion] rights," calling them "Neanderthals." Ex.9 at 9:45; Ex.8 at 10:10-11. Governor Hochul briefly summarized each of the six bills before sitting down to

sign them. Her comment on the Act was as follows: "We're also going to have a task force to study the impact of limited-service pregnancy centers—*we all know what that means*—on pregnant women." Ex.9 at 19:45 (emphasis added); Ex.8 at 17:10-12.

## C. The Commissioner's failure to disavow enforcement

Given the specific language targeting pro-life pregnancy centers, the Sisters of Life became concerned about the Act's impact on their ministry. On July 15, 2022, the Sisters, through their counsel, sent a letter to Commissioner Bassett, with a copy to Kathy S. Marks, General Counsel for the Department of Health. Ex.10. The letter described the Sisters' religious ministry and explained how the Act unconstitutionally interferes with it. *Id*. The Sisters requested that by August 1, 2022, the Commissioner confirm in writing that the Department of Health will not attempt to enforce the Act against the Sisters. *Id*. The Commissioner did not respond.

On August 23, the Sisters reiterated their concerns in a second letter to Commissioner Bassett, again with a copy to General Counsel Marks. Ex.11. The letter requested that the Commissioner confirm in writing, no later than August 26, that the Department of Health will not attempt to enforce the Act against the Sisters. *Id*.

On August 30, counsel for the Sisters received a letter from General Counsel Marks that was dated August 24. Ex.12. The letter did not disavow enforcement as to the Sisters, as they had twice requested. *Id*. The letter reads in its entirety:

> Thank you for contacting us regarding A.5499/S.470, which authorizes the New York State Commissioner of Health to request and receive broad categories of internal information and data from "limited services pregnancy centers". We are reviewing the enacted legislation and determining appropriate next steps for implementation.

Left with no alternative recourse, the Sisters filed this lawsuit on September 2, 2022. Dkt. 1. The Sisters now move for a preliminary injunction.

## LEGAL STANDARD

Preliminary injunctive relief is warranted when a plaintiff shows (1) "irreparable harm absent injunctive relief," (2) "a likelihood of success on the merits," (3) "public interest weighing in favor of granting the injunction," and (4) "that the balance of equities tips in his or her favor." *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (internal quotation marks omitted). "Because the deprivation of First Amendment rights is an irreparable harm, in First Amendment cases the likelihood of success on the merits is the dominant, if not the dispositive, factor." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) (internal quotation marks omitted).

## ARGUMENT

### I. The Sisters of Life are likely to succeed on the merits.

The Sisters of Life are likely to succeed on the merits because the Act violates the Free Speech Clause, the Sisters' church autonomy rights, the Free Exercise Clause, the Sisters' rights of association and assembly, and the Fourth Amendment.

#### A. The Act violates the Free Speech Clause by discriminating based on content and viewpoint.

The Act is subject to strict scrutiny—and "presumptively unconstitutional"—because it regulates speech based on its content and viewpoint. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*, 138 S. Ct. 2361, 2371 (2018) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018) ("Government discrimination against speech because of its message is

presumed to be unconstitutional." (cleaned up)). A regulation is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022). A regulation is viewpoint-based "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The Act is both.

First, the Act is content-based because it only applies to speakers who discuss one particular issue: pregnancy. A speaker does not become subject to the Act by speaking about any other issue of public importance: not opioid addiction, climate change, or racism. If the Sisters tomorrow decided to change their ministry and speak only about end-of-life issues or the dignity of the disabled, the Act would not apply to them. It is only because the Sisters offer to talk to women about one particular issue—pregnancy—that the State asserts the right to obtain their internal documents. Such a speech regulation is "targeted at specific subject matter" and therefore "content based even if it does not discriminate among viewpoints within that subject matter." *City of Austin*, 142 S. Ct. at 1472; *see also Picard v. Magliano*, 42 F.4th 89, 102 (2d Cir. 2022).

But the First Amendment violation here is "all the more blatant" because the Act *does* discriminate against the Sisters based on their viewpoint. *See Rosenberger*, 515 U.S. at 829. Viewpoint discrimination is "an egregious form of content discrimination," in which "the government targets not subject matter, but particular views taken by speakers on a subject." *Id.* The government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the

speaker is the rationale for the restriction." *Id.* Here, all of the Act's intrusive disclosure requirements turn on whether an organization is willing to "refer for . . . abortion care." N.Y. ch. 217 § 1.2. If the Sisters would simply minister to pregnant women from the viewpoint the State prefers—namely, with a willingness to "refer for abortion care"—the Act would not apply to them. But because of the Sisters' pro-life viewpoint, the Act asserts broad governmental power to compel the disclosure of the Sisters' internal documents and information. Because that "facilitate[s] speech on only one side of the abortion debate," the Act is "a clear form of viewpoint discrimination." *See McCullen v. Coakley*, 573 U.S. 464, 485 (2014). Those who agree to "refer for abortion care" can still promise women confidentiality, safely beyond the Act's reach.

Nor is this content and viewpoint discrimination an accident. Even if the law were facially neutral—it is not—strict scrutiny applies where the law "cannot be justified without reference to the content of the regulated speech," or where it was "adopted . . . because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 164 (cleaned up). That is this case. The Act's sponsor memo asserts that pregnancy centers who do not refer for abortion "engage in misleading or deceptive practices" and "provide inaccurate, misleading, or stigmatizing information about abortion." Ex.5. And Governor Hochul's antipathy toward particular viewpoints on abortion was express: she referred to opponents of abortion as "Neanderthals," Ex.8 at 10:10, and said, "We're also going to have a task force to study the impact of limited service pregnancy centers—*we all know what that means*—on pregnant women," *id.* at 17:10-12 (emphasis added). The structure of the task force is further evidence of

viewpoint discrimination.[4] And abortion advocates like Planned Parenthood urged the government to use its power to "study" the opposition. Ex.13. Thus it is no surprise that the Act targets "broad categories of internal information," *see* Ex.12, (including "the nature of information given to clients"), and demands it only from those who will not "refer for . . . abortion care." N.Y. ch. 217 § 2.1. The Act therefore intentionally "covers a curiously narrow subset of speakers" and "le[aves] unburdened those speakers whose messages are in accord with its own views." *NIFLA*, 138 S. Ct. at 2377-78 (cleaned up). No wonder the State billed the law as part of a "nation-leading legislative package to protect abortion." Ex.4.

For these reasons, the Act is a content- and viewpoint-based restriction of speech. It is thus "presumptively unconstitutional," *NIFLA*, 138 S. Ct. at 2371, and subject to strict scrutiny, which it cannot survive. *See infra* Section I.E.

**B. The Act violates the Sisters' church autonomy rights.**

The Act further violates the Sisters' First Amendment right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020). By compelling disclosure of broad categories of internal information—all without any individualized suspicion of wrongdoing or other constitutional protec-

---

[4]    The task force "shall" include an obstetrician-gynecologist whose practice includes "termination of pregnancy," N.Y. ch. 217 § 3—but there is no similar requirement for the task force to include any member with a pro-life viewpoint. And the task force will be selected by the Governor, Senate Majority Leader, and the Assembly Speaker—all of whom expressed pro-abortion viewpoints at the signing ceremony. *See generally* Ex.8.

tions, and entirely based on disagreement the Sisters' religious beliefs—the Act violates the "general principle of church autonomy" that is grounded in both the Free Exercise and Establishment Clauses. *See id.* at 2060-61. The whole point of that autonomy is to guarantee for religious organizations a heightened "independence from secular control or manipulation." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012).[5]

But government "control [and] manipulation" is the Act's very purpose. *See id.* In *Our Lady*, the Supreme Court made clear that "state interference" in the "sphere" of faith and doctrine "would obviously violate the free exercise of religion." 140 S. Ct. at 2060; *see also Rweyemamu v. Cote*, 520 F.3d 198, 208 (2d Cir. 2008) ("The Free Exercise Clause protects a 'church's right to decide matters of governance and internal organization.'").[6] Because "any attempt by government to dictate or even influence such matters would constitute one of the central attributes of an establishment of religion," "[t]he First Amendment outlaws such intrusion." *Our Lady*, 140 S. Ct. at 2060. In a second but "closely linked" sphere, "internal management decisions" that are "essential" to a religious institution's "central mission" are also protected. *Id.*

The Act violates core church autonomy principles by attempting to "dictate" and "influence" the Sisters' decisions on matters of faith and doctrine. *See id.* It does so

---

[5]    In accord with the Supreme Court's usage, the Sisters use the term "church autonomy" to refer to the "independence of religious institutions" of all different faiths. *See Our Lady*, 140 S. Ct. at 2060, 2064-66; *cf. Hyung Jin Moon v. Hak Ja Han Moon*, 431 F. Supp. 3d 394, 405 (S.D.N.Y. 2019) (referring to "ecclesiastical abstention" doctrine).

[6]    The ministerial exception is one "component" of church autonomy. *Our Lady*, 140 S. Ct. at 2060; *see also Belya v. Kapral*, 45 F.4th 621, 628 n.4 (2d Cir. 2022), pet. reh'g pending; *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 199-201 (2d Cir. 2017) (discussing "historical roots" of the ministerial exception).

by imposing intrusive and burdensome disclosure requirements without *any* individualized suspicion of wrongdoing, and based on the Sisters' religious conviction that they must love and serve pregnant women without "refer[ring] for . . . abortion." N.Y. ch. 217 § 1.2. The Act also violates the Sisters' autonomy as to "internal management decisions that are essential" to their "central mission." *See Our Lady*, 140 S. Ct. at 2060. *See* Ex.1 ¶¶ 7, 9. The Sisters' decisions about how to serve pregnant women in need directly relate to internal management and are essential to their mission. The Act seeks to pry into these decisions, running roughshod over the Sisters' ability to "run their own institution[]." *Corp. of the Presiding Bishop v. Amos*, 483 U.S. 327, 341 (1987) (Brennan, J., concurring).

The Act further violates the "procedural . . . components" of church autonomy, *see Butler v. St. Stanislaus Kostka Catholic Acad.*, __ F. Supp. 3d __, 2022 WL 2305567, at *12 (E.D.N.Y. June 27, 2022), which safeguard religious organizations from unnecessary entanglement with the state. *See NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979) (the "very process of inquiry" can "impinge on rights guaranteed by the Religion Clauses"); *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976) (court "inquiry" into internal church procedures is "exactly the inquiry that the First Amendment prohibits"). Courts have long enforced these protections to forbid the "forced disclosure" of a religious group's "internal communications." *Whole Woman's Health v. Smith*, 896 F.3d 362, 374 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1170 (2019); *see also Surinach v. Pesquera de Busquets*, 604 F.2d 73,

78 (1st Cir. 1979) ("compelled disclosure" of internal communications would "substantially infring[e]" church autonomy).

The Act turns these church autonomy protections on their head by purporting to authorize the Commission to "troll[] through" the Sisters' beliefs and records. *Cf. Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality op.). It authorizes Defendant to demand that limited services pregnancy centers disclose everything from personal details about clients to "the nature of information given to clients" and "operational manuals, handbooks [and] guidelines." N.Y. ch. 217 § 1.2. The forced disclosure of that information plainly interferes with the Sisters' internal "decision-making processes" about how best to fulfill their religious mission. *See Whole Woman's Health*, 896 F.3d at 373. It also "induce[s] similar ongoing intrusions" into the Sisters' "self-government," *see id.*—by a state government that views the Sisters as "Neanderthals" for their beliefs. *See* Ex.8 at 10:10. The First Amendment does not permit that result.

### C. The Act violates the Free Exercise Clause.

A law violates the Free Exercise Clause when it "is not neutral or generally applicable." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022) (cleaned up). The Act fails both requirements.

***Not neutral.*** The Act is not neutral because its legislative history and signing statements evince anti-religious animus. "[A] law is not neutral if its object 'is to infringe upon or restrict practices because of their religious motivation.'" *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 162 (2d Cir. 2020) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)). The neutrality inquiry "begin[s] with the text," but "facial neutrality is only the first, and by no

means the determinative, step in a Free Exercise inquiry." *Id.* at 163 (cleaned up). Rather, courts must also "identify even . . . subtle departures from neutrality[] or covert suppression of particular religious beliefs" by "survey[ing] meticulously the totality of the evidence, both direct and circumstantial." *Id.* (cleaned up). This includes "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.* (cleaned up).

Here, the evidence clearly establishes the Act's hostility toward religion. Begin with the Act's "enactment" or "legislative" history. *See Masterpiece Cakeshop, Ltd. v. Col. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). In a prior legislative session, Assemblymember Lavine asserted that limited services pregnancy centers should be regulated because "the religious ideology of [their] owners and employees takes priority over the health and well-being of the women seeking care." Ex.7 at 170-71. Assemblymember Lunsford similarly claimed that all pregnancy centers "purport[] to provide a medical service" but instead "provide[] . . . religious counseling." Ex.6 at 112. As noted above, the Governor's signing statements are of a piece. *See* Ex.8 at 9-11, 17; *New Hope*, 966 F.3d at 166 n.18 ("Gubernatorial signing statements are routinely relied on in construing the reach of New York statutes." (collecting cases)).

In sum, the Act's legislative record gives "every appearance" of dismissing pro-life religious views based on a "negative normative evaluation" of them. *See Masterpiece*, 138 S. Ct. at 1731. When "'official expressions of hostility' to religion accompany laws

or policies burdening religious exercise," courts "'set aside' such policies without further inquiry." *Kennedy*, 142 S. Ct. at 2422 n.1 (quoting *Masterpiece,* 138 S. Ct. at 1732). This Court should do the same.

**Not generally applicable.** The Act also violates the Free Exercise Clause because it is not generally applicable. A law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). Put differently, laws are not generally applicable "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Importantly, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id*.

Here, the Act's purported justification rests on public health grounds—namely, the State's asserted interest in examining "the unmet health and resource needs facing pregnant women in New York." Ex.5. The sponsor memo asserts that "[d]ecisions about pregnancy are time sensitive," and "identifying gaps in health care . . . is critical to achieving optimal health outcomes for women who are or may be pregnant." *Id*. Yet the Act imposes no disclosure obligations on organizations that provide or refer for abortions—even though pregnant women visiting those organizations ostensibly have "unmet health and resource needs" and would benefit from "accurate, non-coercive health care information and timely access to . . . health care services." *Id*. Thus,

the Act treats "comparable secular activit[ies] more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296. That is anything but a generally applicable law. The Act is therefore subject to strict scrutiny, which it fails. *See infra* Section I.E.

**D. The Act violates the Sisters' rights of association and assembly.**

*Association.* The Act further violates the Sisters' First Amendment right to associate with others "for the advancement of beliefs and ideas." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). This right prohibits governmental action that either "direct[ly]" "restrict[s] the right of [persons] to associate freely" or has the "effect of curtailing the freedom to associate." *Id.* at 460-61. Where a group "engage[s] in some form of expression, whether it be public or private," and a law "significantly affect[s] the [organization's] ability to advocate public or private viewpoints," that law is subject to strict scrutiny. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648, 650 (2000).

Here, the Sisters engage in "some form of expression" by bearing witness to the dignity of every human life, especially the unborn. *Id.* at 648. The Sisters support and care for women experiencing crisis pregnancies and engage supporters and volunteers to help carry out that work. Ex.1 ¶¶ 12-13, 19-24, 28-36. In so doing, the Sisters express their religious belief that all human life is sacred because every person is created in the image of God. *Id.* ¶ 7.

The Act also "significantly affect[s]" the Sisters' "ability to advocate [their] viewpoints." *Dale*, 530 U.S. at 650. The Supreme Court has squarely held that "broad and sweeping state inquiries" into "a person's beliefs and associations" "discourage citizens from exercising rights protected by the Constitution." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021) (cleaned up). So too here. The Act's disclosure

requirements chill the Sisters' expressive association by requiring them to make decisions about how they minister and express their religious beliefs in light of Defendant's claimed right to examine their internal documents and information. Ex.1 ¶¶ 28-36. The Sisters' discussions with both pregnant women and supporters are and will be chilled by the parties' awareness of the government's claimed power to obtain documents and information about those discussions and about the women seeking help. *Id.* That is particularly true because the Sisters' supporters and clients alike "face[] a risk of reprisals if their affiliation with the organization became known." *See Bonta*, 141 S. Ct. at 2382 (cleaned up). This "'risk of a chilling effect' on association . . . 'is enough'" to trigger strict scrutiny, *Cornelio v. Connecticut*, 32 F.4th 160, 170 (2d Cir. 2022) (quoting *Bonta*, 141 S. Ct. at 2389), which the Act fails, *see infra* Section I.E.

***Assembly.*** The First Amendment similarly protects the right of people "peaceably to assemble" to engage in religious exercise and speech activities with persons of their choosing. *See Thomas v. Collins*, 323 U.S. 516, 530-40 (1945); *see generally* John D. Inazu, *Liberty's Refuge* (2012). The Sisters assemble with each other, with the women they serve, and with their supporters, affiliates, and volunteers as an expression of their faith. Ex.1 ¶¶ 28-36. Because the Act restricts their First Amendment right, it must face strict scrutiny, which it fails. *See De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) ("right of peaceable assembly" is "cognate to those of free speech and free press and is equally fundamental"); *infra* Section I.E.

### E. The government cannot carry its burden under strict scrutiny.

The Act "can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881

(cleaned up). The Commissioner's burden is to "specifically identify an 'actual problem' in need of solving" and prove that the Act is "actually necessary to the solution." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). This she cannot do.

***No compelling interest.*** The Act's targeting of organizations that do not "refer for . . . abortion care" does not advance any compelling state interest. The State has no legitimate interest in treating pro-life pregnancy centers different from abortion clinics because it considers their message offensive. *See Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017). And the State itself professes uncertainty as to whether pro-life pregnancy centers are even a problem, stating it has only "anecdotal information," which "perhaps [is] erroneous." Ex.6 at 93 (Assembly floor debate). Indeed, the stated purpose of the Act's disclosure regime is just to "study" pregnancy centers. Thus, this case is not *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 247 (2d Cir. 2014), where the court found that a sign requirement would actually "ensure" the satisfaction of a compelling interest in informing women about particular facilities that "have the appearance of a licensed medical facility." By contrast, the State here cannot identify any compelling interest that would be advanced by an inquisition of the Sisters. Under strict scrutiny, the government "bears the risk of uncertainty," and "ambiguous proof will not suffice." *Brown*, 564 U.S. at 799-800. The Commissioner cannot carry her burden to show that obtaining access to the Sisters' documents actually advances any compelling interest.

***Not least restrictive means.*** Nor is the Act the least restrictive means to achieving the State's asserted interest. To meet its burden, the government "must account

for [the Act's] underinclusiveness." *Williams v. Annucci*, 895 F.3d 180, 193 (2d Cir. 2018) (cleaned up). This it cannot do. The Act's "unexplained disparate treatment of 'analogous . . . conduct,'" *see supra* Sections I.A, I.C, amply confirms that "a narrower policy . . . is in fact possible." *Annucci*, 895 F.3d at 193; *see Reed*, 576 U.S. at 172 (law was not narrowly tailored due to underinclusiveness).

The State's publicly stated reasons for the law—to "protect abortion" and ensure women have "timely access" to healthcare—can be pursued much more directly, and in many less restrictive ways, than demanding documents and information from the Sisters. Ex.4; Ex.5. Likewise, if the State believes that any limited services pregnancy center is pretending to practice medicine without a license or defrauding women in some way, it can proceed directly against the alleged wrongdoer. *See McCullen*, 573 U.S. at 494-95 ("individual prosecutions and injunctions" were "less intrusive" means where "police appear[ed] perfectly capable of singling out lawbreakers"). But Defendant cannot hope to justify lumping all pro-life organizations together as "Neanderthals" and declaring a compelling need to subject them all to governmental "study" that involves trolling through all of their documents. *See* Ex.8 at 10:10.

### F. The Act violates the Fourth Amendment.

Separate and apart from its First Amendment defects, the Act also violates the Sisters' Fourth Amendment right to be free from unreasonable searches and seizures.

As a threshold matter, the Act plainly implicates the Fourth Amendment. "A search or seizure within the Fourth Amendment occurs when the state *either* physically occupies private property for the purpose of obtaining information *or* invades a constitutionally protected privacy interest to gather information." *Airbnb, Inc. v. City*

*of New York*, 373 F. Supp. 3d 467, 482 (S.D.N.Y. 2019) (Engelmayer, J.) (cleaned up) (collecting cases). Thus, it is well established that the protection of the Fourth Amendment "extends . . . to the orderly taking under compulsion of process." *United States v. Morton Salt Co.*, 338 U.S. 632, 651-52 (1950).

The Fourth Amendment applies equally to the Act notwithstanding that it requires the Sisters to disclose information provided by the pregnant women they serve. In *Airbnb*, this Court enjoined a municipal ordinance requiring home-sharing platforms to turn over customer data, finding that the platforms had a protected Fourth Amendment privacy interest in the data—even though it "largely relate[d] to users of the platforms, not the platforms themselves." 373 F. Supp. 3d at 483 (discussing *City of Los Angeles v. Patel*, 576 U.S. 409, 412-13 (2015)). The Court recognized that home-sharing services had "very good reasons to keep host and guest information private," including "client relations: Keeping such data private assuredly promotes better relations with, and retention of, a platform's users." 373 F. Supp. 3d at 484. The Sisters have a far greater privacy interest in the sensitive information they receive from pregnant women than does Airbnb in its customer data. Those privacy interests "are more than sufficient to trigger Fourth Amendment protection." *Patel v. City of Los Angeles*, 738 F.3d 1058, 1062 (9th Cir. 2013) (en banc).

Absent consent or exigent circumstances, the Fourth Amendment requires that the subject of an administrative search "must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420. The Act affords no such opportunity. Like the ordinances invalidated in *Patel* and *Airbnb*,

it lacks any mechanism for pre-compliance review before a neutral decisionmaker. The Act thus "creates an intolerable risk that searches authorized by it will exceed statutory limits or be used as a pretext to harass" the Sisters and their supporters. *See Patel*, 576 U.S. at 421. It should be invalidated for that reason alone.

But even if the Act did provide for pre-compliance review, it would still fail to satisfy the Fourth Amendment's "central command" that "official searches and seizures be reasonable." *Airbnb*, 373 F. Supp. 3d at 486; *see Riley v. California*, 573 U.S. 373, 381 (2014) ("The ultimate touchstone of the Fourth Amendment is 'reasonableness.'"). The Fourth Amendment imposes this standard "to safeguard the privacy and security of individuals against arbitrary invasions." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979); *see also In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000) (Fourth Amendment does not permit government to "engag[e] in arbitrary fishing expeditions" or "select[] targets of investigation out of malice or an intent to harass").

The scope of the Act's disclosure requirements is striking. That the Act purports to compel disclosure of "the nature of information given to clients" and the Sisters' "operational manuals, handbooks [and] guidelines" is bad enough. N.Y. ch. 217 § 2.2. Worse still, the Act also compels disclosure of highly sensitive personal details about the pregnant women the Sisters serve, including the geographic regions in which each woman resides, "basic demographic information about each woman, including race, age, and marital status," and whether each woman is "seeking comprehensive options counseling or services at medical facilities." *Id.*

To be sure, the Act hastens to add that "[b]asic demographic information included in any report *shall be published* in the aggregate," such that "it is impossible to identify any particular individual." N.Y. ch. 217 § 2.2(d) (emphasis added). But that makes abundantly clear that the Act compels disclosures as to "*each woman.*" *Id.* (emphasis added). The government's promise to *publish* that information in the aggregate does nothing to alleviate the privacy violation that attends requiring the Sisters to hand over that information in the first place.

Because the Act does all this without a warrant and without any individualized suspicion of wrongdoing, it is nothing more than an "arbitrary fishing expedition[]" into the Sisters' papers. *See In re Subpoena*, 228 F.3d at 349. That plainly violates the Fourth Amendment.

## II. The remaining preliminary injunction factors favor relief.

*Irreparable injury.* By establishing a likelihood of success on the merits of their First Amendment claims, the Sisters have also shown that they will suffer irreparable harm absent an injunction. *A.H.*, 985 F.3d at 184. At this stage, simply "the *alleged* violation of a constitutional right [can] trigger[] a finding of irreparable harm," *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). And a plaintiff need only show a "threat of irreparable harm, not that irreparable harm already [has] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Agudath*, 983 F.3d at 636 (quoting *Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020)). This is especially true where, as here, a

law directly limits speech by "compel[ling] Plaintiffs to make disclosures or face penalties." *Evergreen Ass'n*, 740 F.3d at 246.

Moreover, the Sisters are now forced to minister under a cloud of government investigation. Worse still, the Sisters' relationships of trust and confidence with pregnant women and supporters are chilled by the government's claimed ability to obtain broad categories of documents and information. The Act undermines the Sisters' ability to assure women who come to them for help that information they share, including their personal details and other sensitive information, will remain confidential. This "actual chilling effect" irreparably harms the Sisters' ministry. *See Bronx Household of Faith v. Bd. of Educ. of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003); Ex.1 ¶¶ 28-36.

***Public interest and balance of the equities.*** The public interest and balance of the equities also favor the Sisters. In a suit against the government, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both factors are satisfied here because "securing First Amendment rights is in the public interest" and the government "does not have an interest in the enforcement of an unconstitutional law." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *see also A.H.*, 985 F.3d at 184 (government's "interest in administering its laws . . . is diminished when the laws at issue likely impinge a federal constitutional right").

## CONCLUSION

The Sisters of Life have dedicated their lives to loving God and neighbor. They simply seek to continue their ministry without illegal interference from the government. The Court should grant a preliminary injunction.

Dated: September 16, 2022          Respectfully submitted,

/s/ Angela Wu Howard
Mark L. Rienzi*
D.C. Bar No. 494336
Rebekah P. Ricketts*
Texas Bar No. 24074883
Daniel L. Chen**
California Bar No. 312576
Angela Wu Howard
SDNY Bar No. AW6290
Daniel M. Vitagliano
SDNY Bar No. 5856703
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, D.C. 20006
(202) 955-0095

*Applications *pro hac vice* pending
**Application *pro hac vice* forthcoming

# CERTIFICATE OF SERVICE

I certify that, pursuant to Rule 9.2 of the Electronic Case Filing Rules & Instructions for the United States District Court for the Southern District of New York, I have served a paper copy of this motion and all accompanying documents on Defendant via standard overnight delivery.

/s/ Angela Wu Howard
Angela Wu Howard
THE BECKET FUND FOR
RELIGIOUS LIBERTY
1919 Pennsylvania Ave. N.W.,
Suite 400
Washington, D.C. 20006
(202) 955-0095
awhoward@becketlaw.org